**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 11-130** |
| | * | |
| **CYRUS CASBY** | * | **SECTION "L"(3)** |

## ORDER AND REASONS

The Court has pending before it Defendant Cyrus Casby's Motion to Suppress
Confession. (Rec. Doc. 97). The Court has reviewed the briefs and the applicable law and heard
oral argument, and now issues this Order and Reasons.

## I.     BACKGROUND

This case arises out of the alleged arson of an apartment, resulting in death and personal
injuries to the occupants. At approximately 4:00 a.m. on November 10, 2004, Jefferson Parish
sheriff's deputies and firefighters were called to a two-story four-plex at 1005 Tallowtree in
Gretna, Louisiana. Inside Apartment C of the building, there was a fire on the second floor
landing. After the firefighters extinguished the fire they found in the upstairs bedrooms Cynthia
Carto; Ms. Carto's baby, Cyanna; Ms. Carto's brother Cleveland McGinnis, Jr.; Ms. Carto's
mother, Janis; and Ms. Carto's brother Jarvis. All except Jarvis were deceased. Ms. Carto had
died from multiple stab wounds before the fire started. Mr. McGinnis also had stab wounds, but
they were non-lethal. Cyanna died from smoke inhalation. Janice had a lethal stab wound but
was still alive when the fire started. Within an hour, the Defendant Cyrus Casby, father of
Cyanna, was taken to the Jefferson Parish Sheriff's Office. Over the next several hours, law
enforcement interrogated Casby, and he provided three statements, the details of which are

-1-

described below. Following the third statement, the Sheriff's Office placed Casby under arrest.

Casby was indicted by a Jefferson Parish grand jury with four counts of first-degree murder and one count of attempted first degree murder. These charges were later reduced to second-degree murder and attempted second-degree murder. The only issue at trial was the identity of the person who committed the crimes. On May 31, 2008, the jury acquitted Casby on all counts.

On June 2, 2011, a federal Indictment for Arson of a Building Affecting Interstate Commerce Resulting in Death and Physical Injury was returned against the Defendant. (Rec. Doc. 1). In the Indictment, the Grand Jury charges that on or about November 10, 2004, in the Eastern District of Louisiana, Casby "maliciously damaged and destroyed and attempted to destroy, by means of fire and explosive materials, the multi-residential building at 1005 Tallowtree Apartment "C" in Harvey, Louisiana," and resulted in the death of "Cyanna Carto (age 10 months) and Cleveland McGinnis, Jr. (age 11 years old)" and personal injuries "to Janice Carto (age 32 years old), Jarvis Carto (age 10 years old), and Fireman Walter Allen," all in violation of 18 U.S.C. § 844(i). *Id.*[1]

Defendant has previously filed two motions to dismiss the Indictment, arguing violations of both the Commerce Clause and the Double Jeopardy Clause of the U.S. Constitution, and also arguing that the Indictment improperly included two offenses in a single count. (Rec. Docs. 34, 43). On March 16, 2012, the Court issued an Order and Reasons denying both motions. (Rec.

---

[1] A Notice is attached to the Indictment stating that certain of the charges in the Indictment carry a maximum penalty of death if the Department of Justice chooses to seek the death penalty. (Rec. Doc. 1-3). However, the Government has since filed a Notice of Intent Not to Seek the Death Penalty. (Rec. Doc. 105).

Doc. 66). The Court has also convened regular status conferences with the parties throughout the pendency of the case.

## II.      PRESENT MOTION

Defendant now moves to suppress the third statement that he made to the Jefferson Parish Sheriff's Office pursuant to Federal Rule of Criminal Procedure 12(b)(3). (Rec. Doc. 97). Defendant argues that the statement was obtained in violation of the Fifth Amendment. Specifically, Defendant lists seven circumstances surrounding his statement that render the confession involuntary, including claims that he was physically abused and was deceived regarding his access to legal counsel. Defendant also argues that he did not provide this statement pursuant to a valid *Miranda* waiver. The Government opposes the motion and argues that Defendant knowingly, intelligently, and voluntarily waived his Fifth Amendment Rights. (Rec. Doc. 114). The Government argues that each of the seven circumstances that Defendant describes either does not rise to the level of a Fifth Amendment violation or relies on Defendant's own uncorroborated testimony, which the Government argues that the Court should not credit.

## III.     FACTUAL FINDINGS

The parties have submitted significant written evidence of Defendant's interrogation and three statements, including the transcripts from his Jefferson Parish trial, at which the Defendant gave testimony describing the interrogation. Additionally, during the hearing on the instant motion, this Court heard testimony from two members of the Jefferson Parish Sheriff's Office, Detective Jeffery Rodrigue and Chief Tom Gorman. Based on all the evidence, the Court finds the following facts.

A.      **The Defendant's Arrival and *Miranda* Waiver**

As described above, the Jefferson Parish Sheriff's Office and fire department were called to the scene at approximately 3:45 a.m. on November 10, 2004. Detective Rodrigue arrived at approximately 4:20 a.m. (Rodrigue Test). Shortly thereafter, the Defendant arrived at the scene. A different officer or officers brought Defendant to the Sheriff's Office for questioning, though they did not place him under arrest at that time. (Rodrigue Test.). Detective Rodrigue also returned to the office and proceeded to interview the Defendant. (Rodrigue Test.). He presented Defendant with a form titled "Rights of Arrestee or Suspects," detailing the Defendant's *Miranda* rights. (Gov't Ex. A). During his Jefferson Parish trial, the Defendant testified that the form was still blank when he signed it. (Trial Tr. at 113). However, the Court credits Rodrigue's testimony that he filled in the form before presenting it to the Defendant. (Rodrigue Test.; Trial Tr. at 193).

Rodrigue then read the Defendant's *Miranda* rights to him and also gave him an opportunity to read them himself. (Rodrigue Test.; Trial Tr. at 193). At 5:45 a.m., Casby signed the form, indicating both that he had been read his *Miranda* rights, and that he understood and waived them. (Gov't Ex. A; Trial Tr. at 194). Rodrigue also signed the form, indicating that he had read Casby these rights. (Gov't Ex. A; Trial Tr. at 194). At his Jefferson Parish trial, Casby agreed that Rodrigue did not threaten or mistreat him at this time. (Trial Tr. at 60). Casby also agreed that Rodrigue told him he was not under arrest. (Trial Tr. at 59-60). Casby did claim that Rodrigue told him it would take some time to get a lawyer:

> He told me since it was so early in the morning, that he would have to wait to get me a lawyer, and if you really want to wait, that's probably going to be close to the end of the day. So if you want to make a statement, you're going to have to do it without a lawyer.

(Trial Tr. at 60). However, the Court credits Rodrigue's testimony rather than Casby's, and declines to find that Rodrigue made any such statements.

**B.      Defendant's First and Second Statements**

At 5:58 a.m., Casby gave his first statement to Rodrigue. (Rodrigue Test.). All three of Casby's official statements were tape recorded and were later transcribed. (Gov't Exs. 2-7). The tape recording and transcript of the first statement indicate that before interrogating Casby, Rodrigue mentioned that the statement was being taken "regarding a . . . murder having occurred" and "by Detective Jeffery Rodrigue of the Sheriff's Office, Homicide Section." (Gov't Ex. B at 1; Gov't Ex. 2). Casby testified that Rodrigue said the word "murder" in a quiet voice, and Casby did not hear. (Trial Tr. at 114). However, the Court finds that Rodrigue made these comments out loud and at a normal volume. (Gov't Ex. 2).

Early in the interview, Rodrigue referred to an apartment fire that had occurred that night. (Gov't Ex. B at 5). Later in the interview, Casby stated: "I heard you say something about a murder earlier, heard something about fire, nobody still told me what happened to this point." (Gov't Ex. B at 18). Rodrigue then told Casby that "there was a fire set in the house" and that "people died as a result," though he told Casby that the number of survivors was "still unknown at this time." (Gov't Ex. B at 18). Similarly, at the hearing on Defendant's motion, Rodrigue testified that while taking Defendant's first statement, he was not aware of who the victims were. (Rodrigue Test.). He knew there were three victims and that two children had been moved to the hospital, but he did not know who they were. (Rodrigue Test.). He also did not know that one of these victims had subsequently died at the hospital. (Rodrigue Test.). The Court finds this testimony credible.

Casby testified that when he gave his first statement, his "main objective was to find out" what had happened. (Trial Tr. at 61). He testified that "all that time I was there, I still never found out what happened," and that finding out what happened was his "mission or purpose to be there." (Trial Tr. at 81). According to Casby, the police told him "inconsistent stories" about who had survived the fire and who had died, including telling him at one point that his daughter was still alive. (Trial Tr. at 81).

The first interview lasted approximately 20 minutes. (Gov't Ex. 2; Rodrigue Test.). As noted above, the overall content of Defendant's first statement was exculpatory. After the first statement was finished, Rodrigue continued to talk to the Defendant off the record for the next hour, although Rodrigue may not have been in the room with Defendant at all times. (Rodrigue Test.; Trial Tr. at 216). Casby testified that during this time, he and Rodrigue discussed Casby's having left the knife on the dresser. (Trial Tr. at 61). Rodrigue testified that he decided to take a second statement because the Defendant had changed his story. (Rodrigue Test.; Trial Tr. at 216).

At 7:15 a.m., Casby gave a second statement. (Gov't Exs. C, 4; Rodrigue Test.). Again, Rodrigue stated at the outset of the questioning that the statement was being taken "regarding a homicide at 1005 Tallowtree Lane." (Gov't Ex. C at 1; Gov't Ex. 4). Early in the questioning, Rodrigue also stated, and Casby agreed, that after Casby gave his first statement, he and Rodrigue had "continued to talk about . . . the events leading up to . . . a house fire and stabbing that occurred at [Casby's] girlfriend's house tonight." *Id.* The content of the second statement

was also exculpatory, though it was inconsistent with the first statement.[2] This second interview

lasted approximately five minutes, meaning that it finished at approximately 7:20 a.m. (Rodrigue

Test.).

## C.      The Gap Between Defendant's Second and Third Statements

A period of three hours passed between Defendant's second and third statements.

Rodrigue did not record any of his interactions with Defendant during this time. The

Government's account of these three hours differs substantially from the Casby's. For the

reasons explained below, the Court credits the Government's version of events.

### 1.       The Government's Version

The Government asserts that during this three-hour gap, Rodrigue and his colleagues

continued to investigate the fire, sometimes speaking with Casby, but never mistreating him in

any way. Rodrigue testified that he continued to speak with Casby "off and on" between the

second and third statements. (Rodrigue Test.). During the "off" periods, Rodrigue testified that

he spent most of his time at his desk, which was directly across the hall from the interrogation

room, and which faced the doorway such that Rodrigue would have seen if anyone went in or

out. (Rodrigue Test.). But Rodrigue did admit on cross-examination that he may have left his

desk to use the bathroom at some point, meaning that his view of the room might have been

interrupted, if only briefly. (Rodrigue Test.; Trial Tr. at 260).

_____

[2] Specifically, in the first statement, Casby had described a confrontation with two men outside his girlfriend's apartment when he had been visiting earlier in the evening, during which his phone and CD player had been stolen, and he had received a minor injury. In the second statement, Casby added that after this confrontation, he had gone back inside, "grabbed a knife" from his girlfriend's kitchen, and thought about "going back outside," but decided against it when he saw that the two men were "gone already." _Id._ at 2-3. Casby stated that he left knife on the dresser in the bedroom. _Id._ at 4.

At some point during this period, Rodrigue discovered that another witness had identified the Defendant fleeing the scene of the fire. (Rodrigue Test.). Around 8:45 a.m., Casby consented to a DNA search. (Rodrigue Test.; Trial Tr. at 226-27). Also around this time, the JPSO took photographs of the Defendant, because the other witness had described an object in the suspect's hair that matched the Defendant's appearance. (Rodrigue Test.; Trial Tr. at 224-26; Exs. 9-14). Rodrigue testified that another purpose of the photographs was to document Defendant's cut hands, which Defendant claimed were from when his radio was stolen. (Rodrigue Test.).

Sometime after the photographs and DNA samples were taken, Rodrigue confronted Casby with the other witness's statement, but Casby denied having fled the scene of the fire. (Rodrigue Test.). Rodrigue testified that at that time, he believed he had probable cause to arrest the Defendant. (Rodrigue Test.). Accordingly, Rodrigue returned to his desk to fill out a probable cause affidavit, which took about 10 minutes, and which Rodrigue finished around 10:00 a.m. (Rodrigue Test.; Trial Tr. at 230).

Rodrigue testified that around this time, or shortly thereafter, Chief Tom Gorman (then Colonel Gorman) went into the interrogation room to speak with Casby. (Rodrigue Test.). Gorman testified that he decided to go into the room after asking Rodrigue what was happening and learning that Casby was sticking to his story, which contradicted the JPSO's other evidence. (Gorman Test.; Trial Tr. at 232). Although Gorman did not know all the specifics of the investigation at that time, he had a general awareness of the exculpatory nature of Casby's first two statements. (Gorman Test.). Gorman testified that he went into the room and told Casby that he knew that what Casby was saying was not true. (Gorman Test.). In response, Casby said, "They attacked me." (Gorman Test.). Gorman testified that he did not interrogate Casby, nor did

he mention anything about an attorney. (Gorman Test.). Gorman came back out of the room

approximately 10 minutes later and told Rodrigue what Casby had said, and that Casby wanted

to give another statement. (Rodrigue Test.; Trial Tr. at 232).  On cross-examination, Gorman

admitted that the JPSO's log sheet showed an entry from Daniel Belfield at 8:40 a.m., with

"Cyrus Casby" written under the "Purpose" column. (Gorman Test.). However, Gorman also

testified that Casby never mentioned an attorney while Gorman was speaking to him.

Rodrigue testified that he did not see anyone other than Chief Gorman enter the

interrogation room. (Rodrigue Test.). Regarding Officer Don English, Rodrigue testified that

English had spent most of the morning at the crime scene, then returned to the office to type up a

search warrant. (Rodrigue Test.; Trial Tr. at 263). Rodrigue could not recall whether he

personally saw Officer English at the office during this period. (Rodrigue Test.). He did recall

that Officer English must have gone to court to get the warrant signed during this three-hour

period, since it was signed at 10:26 a.m. (Rodrigue Test.; Trial Tr. at 254). Rodrigue denied

making any promises or threats to Casby, and denied physically abusing Casby at any point

during the interrogation. (Trial Tr. at 196, 216-17, 232-33). Rodrigue testified that he offered

Casby refreshments and gave him restroom breaks throughout the time Casby was in the station.

(Rodrigue Test.; Trial Tr. at 247).

### 2.    The Defendant's Version

Casby's account of this three-hour gap is very different. Casby agreed in his state court

testimony that after some further, more accusatory interrogation by Rodrigue, police officers

took photographs of him and also took DNA samples. (Trial Tr. at 66, 72). But according to

Casby, after the other officers left him and Rodrigue alone, Rodrigue began to abuse him

physically:

> A. After they left . . . that's when the physical beating started.
> Q. And what did he do to you?
> A. Choked me; punched me; slapped me. But when he doing it,
> I'm noticing when he hit me in my face, he only smacked me, so it
> don't leave no marks. When he hit me in the body, that's when he
> punched me. When he choked me, he's not choking me like this,
> he's got his forearm on my neck. . . .

(Trial Tr. at 72). Casby testified that Rodrigue started to do this because he "stopped

cooperating" and "didn't want to talk." (Trial Tr. at 73). He testified that Rodrigue deliberately

hit and choked him in such a way that he did not leave any marks on Casby's body, and told him

that was what he was doing. (Trial Tr. 156). He denied having been knocked unconscious, but

stated that "[t]he worst" was when Rodrigue "hit [Casby] with a taser" on the left hip, which

allegedly happened while Casby was handcuffed to his chair. (Trial Tr. at 74). According to

Casby, Rodrigue did this in retaliation for Casby's attempts to "block" Rodrigue's blows earlier

on. (Trial Tr. at 157).

Casby also testified that the police led him to believe that another police

officer—specifically, Detective English—was actually his family's lawyer. (Trial Tr. at 75).

According to Casby, Rodrigue said, "I'm going to give you a moment with the lawyer, your

parents outside," then brought a man into the room and said, "I'm going to give y'all a moment

by yourself to talk." (Trial Tr. at 75). Casby testified that he thought this man was his family's

lawyer, but he later discovered it was actually Officer English. (Trial Tr. at 75). Casby testified

that this man was telling him "[i]t's not looking good" for several specific reasons, and then told

him, "look, I don't think you can beat this," citing the high rates of conviction in Jefferson

Parish. (Trial Tr. at 76-77). Casby testified:

> He wanted me to take a deal for manslaughter and all that crazy
> stuff. . . . He wanted me to confess to make it look like self-defense
> or the heat of passion and manslaughter, something like that, and
> work the deal out with them. . . . In that case was so hostile,
> somebody was going to take the fall, and I was the number one
> candidate.

(Trial Tr. at 76, 78). When Casby balked at this idea, the man said he did not want the case

"because it's a waste of time" and was going to tell Casby's family that he would not be able to

help Casby. (Trial Tr. at 76). The man left, and at that point, Casby testified that "what he said

was dawning on [his] mind, thinking that that was the last [hope] he had leaving," because the

family lawyer would presumably do more for Casby than any other lawyer. (Trial Tr. at 78, 127).

Casby also testified that the detectives encouraged him to cooperate in exchange for more

favorable treatment at other times during the interrogation. For example, Casby testified that the

detectives told him that if Casby could "give them something to work with," such as by

"mak[ing] it look like [he] was being attacked," they would "take care of the rest." (Trial Tr. at

85). According to Casby, the detectives made it seem like they and Casby were "a team": "You

give us something to work with, we going to give you the deal in exchange." (Trial Tr. at 85,

118).

### 3.    The Court's Findings

During the hearing on Defendant's motion, the Court heard detailed and credible

testimony from Rodrigue and Gorman on what took place during this three-hour period. To a

large extent, their accounts corroborated one another, and also matched Rodrigue's testimony

from Defendant's Jefferson Parish trial. Defendant's testimony, on the other hand, is mostly

uncorroborated. This fact is especially problematic given Defendant's allegations of relatively

serious physical abuse, as neither the photographs of Defendant nor the medical evaluation from

his booking into custody show any evidence of physical abuse. The Court acknowledges that Defendant specifically claims that his alleged abuser knew how to hurt him without leaving any physical traces. However, this claim is not enough to persuade the Court to credit Defendant's testimony, especially in light of its self-serving nature.

Similarly, the Court does not credit Casby's testimony regarding Officer English's allegedly deceptive behavior. Here, the Defendant's testimony is not completely uncorroborated, as the JPSO's log sheet shows that Daniel Belfield did come to the office to see the Defendant. However, both Rodrigue and Gorman testified that English was busy trying to obtain a search warrant at the approximate time when Defendant claims to have spoken to him. Furthermore, the Court credits Rodrigue's testimony that after the photographs and DNA search were complete, no one other than Rodrigue and Gorman entered the room. The Court also credits Rodrigue's repeated assertions that he made no promises or threats to Casby while interrogating him. In sum, Casby's uncorroborated testimony is self-serving and not credible. Accordingly, the Court finds that the Government's account of the three-hour period between the second and third statements is correct.

## D.     Defendant's Third Statement

Around 10:00 a.m., Rodrigue went back into the room with Casby for a third interview. (Rodrigue Test.). According to Rodrigue, Casby would have been free to leave up until this point. (Rodrigue Test.). After 10:00 a.m., however, Rodrigue testified that Casby would no longer have been free to leave. (Rodrigue Test.). Rodrigue did not testify that he actually placed Casby under arrest at this time, nor did he apparently inform Casby of these changed

circumstances in any way. (Rodrigue Test.; Trial Tr. at 81, 232-33).[3] Casby testified that shortly

before giving this third statement, Rodrigue was telling him that Cyanna was still alive and

suggested that Casby's cooperation could help his daughter:

> He made it seem like since I will cooperate, he was going to help
> me and be truthful with me. He told me that she already lost one
> parent; he wanted to reassure me she wouldn't lose another one.
> So, like I said, they made it seem like that's what we was going to
> do. That's—you put that and making a statement between me
> getting back to my daughter, that's an easy price to pay.

(Trial Tr. at 81).

Casby gave his third statement beginning at approximately 10:20 a.m. (Trial Tr. at 218;

Rodrigue Test.; Gov't Ex. D). This statement was inculpatory and is the subject of the present

motion. Again, at the beginning of the statement, Rodrigue stated that it was being taken

"regarding a murder" and that he belonged to the homicide department. (Gov't Ex. D at 1).

Rodrigue also reminded the Defendant of his rights, as follows:

> Rodrigue: And are, are you still aware of your rights um—
> Casby: Yes.
>
> Rodrigue: —that we, we talked about earlier from this rights form
> here in front of me?
> Casby: Yes.
>
> Rodrigue: Okay. And you're still freely speaking to me. Is that
> correct?

---

[3] Casby did not provide any credible testimony indicating that circumstances had
changed from his first and second statements to his third statement, such that he would believe
he was no longer free to leave. As explained above, the Court does not credit Casby's allegations
of threats and beatings by law enforcement. Casby did testify, when describing why he had given
the third statement, that he "wanted to establish the fact that [he] was under arrest or whatever
they called it, the torture that they put [him] through." (Trial Tr. at 146). However, this testimony
seems to refer to the alleged abuse, rather than any credible allegations that Rodrigue or Gorman
had actually placed Casby under arrest at the time of the third statement.

-13-

Casby: Yes.

(Gov't Ex. D at 1). In that statement, Casby described having found his girlfriend in bed with another man. (Gov't Ex. D at 2). An argument between Casby and his girlfriend and her family ensued, and ultimately escalated to the point of violence. (Gov't Ex. D at 2-4). Casby said that both Cynthia Carto and Janice Carto were hitting him and trying to attack him with knives. (Gov't Ex. D at 4). At that point, he said that he attacked both of them and one of Cynthia's brothers with a knife. (Gov't Ex. D at 4). Casby said that the apartment then caught on fire by accident, when he knocked over a candle on his way out. (Gov't Ex. D at 8).

The Defendant was apparently formally arrested sometime after providing this statement. Rodrigue prepared the booking form, and he and another officer transported Defendant to a correctional facility. (Rodrigue Test.). As part of the booking procedure, Casby was photographed and received a medical evaluation. (Rodrigue Test.; Trial Tr. at 250). The medical evaluation did not indicate that Casby had suffered any physical injuries. (Rodrigue Test.; Trial Tr. at 250).

**E.     Defendant's Education and Background**

During the Jefferson Parish trial, Casby also testified about his job and educational background. He worked as a merchandiser for Pepsi, the duties of which included driving to various stores, filling vending machines and coolers, and building and looking after store displays. (Trial Tr. at 36). He also stated in November 2004, that he was studying business at Delgado Community College. (Trial Tr. at 36). Casby testified at trial that he had never been convicted of any crimes before being arrested in connection with this case. (Trial Tr. at 34).

## IV.    LAW & ANALYSIS

### A.    *Miranda* Waiver

#### 1.    Legal Standard

A person must be advised of his rights at any time when that person is taken into custody or otherwise deprived of his freedom and is subject to questioning. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The right to receive the *Miranda* warnings attaches when the defendant is in custody and subject to interrogation, that is, either when the defendant is formally arrested or when he is deprived of freedom of movement in such a way that would constitute a formal arrest. *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005). In determining whether a suspect is in custody at the time of an interrogation, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *see also Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam) (stating that "[a]n officer's knowledge or beliefs" may be relevant to custody if "conveyed, by word or deed").

After the *Miranda* warnings have been given, a suspect may knowingly and intelligently waive his or her rights and agree to answer questions. *Miranda,* 384 U.S. at 479. The government bears the burden of demonstrating that the *Miranda* warnings were validly given and that the defendant validly waived his or her right against self-incrimination. *United States v. Rico*, 51 F.3d 495, 507 (5th Cir. 1995). The district court determines the voluntariness of the defendant's waiver by looking at the totality of the circumstances for two elements: 1) whether the waiver was an act of free and rational choice, without coercion, and 2) whether the waiver was made with an awareness of its consequences. *United States v. Cardenas*, 410 F.3d 287, 293

(5th Cir. 2005) (citing *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)).

**2.     Analysis**

Defendant does not appear to dispute that he received *Miranda* warnings before giving his first statement to Detective Rodrigue. Instead, Defendant suggests that he did not validly waive his *Miranda* rights before giving his third statement, because he received his *Miranda* warnings before he was actually in custody. It is well established that *Miranda* applies only to custodial interrogation. As Rodrigue testified, Defendant claims that he was free to leave while giving his first and second statements, and therefore, they were non-custodial. However, Defendant argues that he was no longer free to leave while giving his third statement, because at that time, Rodrigue had already prepared the paperwork for Defendant's arrest. Defendant also cites Rodrigue's testimony that Defendant would not have been free to leave at that time, although Defendant agrees that Rodrigue did not actually inform Defendant that he was under arrest.

Defendant argues that this change in circumstances invalidates his *Miranda* waiver because a suspect cannot anticipatorily waive his *Miranda* rights. In *McNeil v. Wisconsin*, 501 U.S. 171 (1991), the Supreme Court noted that it had "never in fact held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation,'" and that "[m]ost rights must be asserted when the government seeks to take the action they protect against." *Id.* at 182 n.3. Defendant also proposes that this Court follow an opinion of the West Virginia Supreme Court of Appeals, which held that "where police have given Miranda warnings outside the context of custodial interrogation, these warnings must be repeated once custodial interrogation begins." *West Virginia v. Bradshaw*, 457 S.E.2d 456, 467 (W. Va. 1995). In

-16-

*Bradshaw*, the defendant had voluntarily accompanied the police to the station, received multiple *Miranda* warnings, agreed to a polygraph examination, and then asked to leave the station. *Id.* at 463. Following that request, the police placed the defendant under arrest and re-administered *Miranda* warnings. *Id.* The West Virginia Supreme Court of Appeals held that such warnings were actually required and were properly given in this case. *Id.* at 467-68.

The Government argues that the Court need not reach the question of whether Casby anticipatorily waived his *Miranda* rights, because Casby was actually in custody for the entire time he was in the JPSO bureau. The Government suggests that a reasonable person in the Defendant's position would not have felt free to end the interrogation because the police brought the Defendant to the JPSO station and isolated him in the interrogation room for several hours, where they indicated that they were investigating a murder and treated him as a suspect. Because a suspect need not "be continually reminded of his *Miranda* rights following a valid waiver," *Soffar v. Cockrell*, 300 F.3d 588, 593 (5th Cir. 2002) (citations omitted), the Government argues that the Defendant's waiver of his *Miranda* rights at the beginning of the interrogation remained valid for the entire interrogation.

Moreover, the Government argues that the decision to arrest the Defendant following his first two statements did not trigger a need to re-administer *Miranda* warnings, especially since it is undisputed that Rodrigue reminded the Defendant of those rights at the beginning of the interview. *Singleterry v. Schiro*, No. CV-06-2380-PHX-DGC, 2009 WL 536547 (D.Ariz. Mar. 4, 2009). In *Singleterry*, the defendant initially participated in a voluntary interview with the police, then received *Miranda* warnings before continuing the interview. *Id.* at *3, *16. The court concluded that this second portion of the interview was custodial. *Id.* at *3. Following the second

-17-

interview, the police booked the defendant into jail. *Id.* at *17. The next morning, the police interrogated the defendant again, not re-administering the *Miranda* warnings, but reminding the defendant of his rights. *Id.* at *17. The *Singleterry* Court held that the defendant's statements during this final interrogation were given pursuant to a valid *Miranda* waiver. *Id.* at *3, *22. Thus, the Government argues, the booking of a defendant between an earlier custodial interrogation and a later custodial interrogation does not require the police to re-administer *Miranda* warnings.

To determine whether Casby was in custody at any point during his interrogation, this Court must examine how a reasonable person in Casby's position would have understood his situation. When examining the five hours of questioning from Casby's perspective, rather than Rodrigue's, the Court is unable to conclude that there was any change in circumstances between the second and third statements that could justify a finding that the third interview was newly custodial. Defendant emphasizes that before taking the third statement from the Defendant, Rodrigue had—outside the presence of the Defendant—filled out the Probable Cause Affidavit with the plan of arresting the Defendant. Additionally, Defendant cites Rodrigue's testimony that Defendant would no longer have been free to leave. Crucially, however, Casby points to no evidence that Rodrigue had actually conveyed any of these intentions to Casby himself, "by word or deed." *Stansbury*, 511 U.S. at 325. Because Rodrigue did not convey his intentions or beliefs to Casby, the Court is unable to conclude that those intentions or beliefs affected "how a reasonable person in the position of the individual being question would gauge the breadth of his or her freedom of action." *Id.* (internal quotation marks omitted); *see also Berkemer*, 468 U.S. at 441-42 (holding that defendant was not "in custody" for *Miranda* purposes at time of giving

statement because, even though police officer planned to arrest defendant, officer had not communicated those intentions to defendant). From Casby's perspective, the circumstances did not indicate that his freedom of action had been newly "curtailed to a degree associated with formal arrest" before he gave his third statement. *Berkemer*, 468 U.S. at 440 (internal quotation marks omitted).

Thus the Court is left with two possibilities. The first is that, as the Government argues, Casby was in custody for all three of his statements. The second is that the police took Casby into custody only after he provided his third statement, when he was actually booked into jail. Neither scenario would have required the JPSO to re-administer *Miranda* warnings before Casby gave his third statement. Either the police properly administered *Miranda* warnings at the beginning of the custodial interrogation, or Casby remained free to leave the entire time the police questioned him and therefore no *Miranda* warnings were actually required at all. While the Court believes that the former scenario is more plausible, it does not need to reach this issue in order to conclude that no *Miranda* violation occurred in this case.

**B.    Voluntariness of the Confession**

**1.    Legal Standard**

In general, before a defendant's statement can be used against him, the government bears the burden of proving by a preponderance of the evidence that the statement was given voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The standard for determining whether a confession or inculpatory statement is voluntary is whether, taking into consideration the "totality of the circumstances," the statement is the product of the accused's "free and rational" choice. *United States v. Ornelas-Rodrigues*, 12 F.3d 1339, 1347 (5th Cir. 1994). The question of

voluntariness requires "an assessment of human motivation and behavior" by the district court. *United States v. Martinez-Perez*, 625 F.2d 541, 542 (5th Cir. 1980). A statement is involuntarily if the government obtained it by physical or psychological coercion or by improper inducement such that the suspect's will was overborne. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963).

**2.    Analysis**

In arguing that his confession was a product of the Government's coercion, the Defendant cites seven different circumstances surrounding his confession. The Court addresses each factor individually below.

**a.    Youth and Lack of Education**

The Defendant argues his youth and lack of education contributed to the ability of the police to coerce him into confessing because at the time of his interrogation, he was "a teenager with limited education." (Rec. Doc. 97-1 at 4). Specifically, at the time of his confession, Defendant was 19 years old and had completed only two semesters of community college. However, as pointed out by the Government, a juvenile defendant is capable of giving a voluntary confession. In *Fare v. Michael C.*, 442 U.S. 707 (1979), the Supreme Court held to be voluntary the confession of a 16½-year-old juvenile with prior experience with the criminal justice system. *Id.* at 726 The Defendant may have had less experience with the criminal justice system than the juvenile defendant in that case, but he was also older and more educated. Thus, Defendant's relative youth and lack of education do not render his confession involuntary, though the Court will consider them in combination with the other six factors.

**b.    Length of Detention and Sleep Deprivation**

Defendant also argues that his confession was involuntary because he was exhausted due

to lack of sleep and the length of the interrogation he experienced. Casby arrived at the scene of the crime sometime after the emergency call was made at 3:45 a.m. He was taken to the JPSO bureau immediately after arriving at the scene and identifying himself, at which point he was interrogated. Casby gave the statement that he now seeks to suppress at approximately 10:00 a.m. Defendant claims that the length of his detention was approximately five hours, during which he was repeatedly interrogated.

With respect to the length of his detention, Defendant seeks to analogize his circumstances to those in *United States v. Hernandez*, 574 F.2d 1362 (5th Cir. 1978). The defendant in that case received *Miranda* warnings at the scene of the crime, at which point he declined to make a statement and may have asked to consult with a lawyer. *Id.* at 1365-66. Law enforcement then detained the defendant in a police car with two other suspects for approximately five hours before driving him to the station a short distance away. *Id.* at 1366. At the station, the defendant "was given his *Miranda* warnings on three or perhaps four separate occasions." *Id.* (internal quotation marks omitted). Despite the defendant's repeated invocation of his rights, the police continued to initiate questioning, and eventually, the defendant made an inculpatory statement. *Id.* In holding the defendant's confession involuntary, the Fifth Circuit emphasized that he had been "effectively held incommunicado" for approximately five hours "in the close quarters of the police wagon," and that the police had applied "coercive pressure" to him when they made "repetitive efforts to elicit comment from him" despite his invocation of his right to remain silent. *Id.* at 1368.

As the Government points out, there are two crucial distinctions between *Hernandez* and the instant case. First, although the police confined both Casby and Hernandez for five hours,

Casby was not confined "in the close quarters of [a] police wagon" with no freedom of movement; he was questioned at the police station, where he was allowed to use the restroom and was given refreshments. Second, Casby never invoked his right to remain silent while being questioned. This latter distinction appears to have been particularly important to the Fifth Circuit's conclusion that the police coerced Hernandez into confessing. As a result, the Court declines to hold that the length of interrogation in this case made Casby's confession involuntary.

Neither has Casby shown that his confession was involuntary due to sleep deprivation. The Fifth Circuit has held confessions to be voluntary even in circumstances of significantly greater sleep deprivation and overall impairment than Defendant experienced here. For example, the Fifth Circuit held that one defendant's confession was voluntary despite the fact that he had not slept for three days and had ingested methamphetamine shortly before his arrest. *United States v. Reynolds*, 367 F.3d 294, 297-99 (5th Cir. 2004). The court rested its conclusion on the lack of any outward manifestation of fatigue or intoxication by the defendant during the interrogation. *Id.* at 299; *see also Muniz v. Johnson*, 132 F.2d 214, 220 (5th Cir. 1998) (noting that defendant did not complain of fatigue, request time to rest, or claim to have been promised rest in exchange for confession); *cf. Brock v. United States*, 223 F.2d 681, 685 (5th Cir. 1955) (holding that inculpatory statements made while defendant was actually asleep should have been suppressed). The Defendant has not cited any evidence of fatigue in this case, and any sleep deprivation he experienced was relatively minor.[4] Therefore, the Court will not suppress Casby's

---

[4] Even though Casby was questioned between approximately 5 a.m. and 10 a.m., he testified at trial that he slept for a few hours the previous evening after getting home from work. That fact further distinguishes this case further from *Reynolds*, because Casby does not allege

confession solely on the basis of sleep deprivation.

### c.     Lack of Knowledge of Nature of Offense

The Defendant also argues that the officers questioning him concealed from him "the true nature" of the offense for which he was being questioned. As described above, Casby testified that Officer Rodrigue told him he was not under arrest and that when he signed the Rights of Arrestee form, the top of the document was not yet filled in with the charge of murder. Additionally, Casby claims that Rodrigue gave him inconsistent information about whether anyone had survived the fire, including telling him at one point that his daughter had survived. Casby claims that Rodrigue lowered his voice when saying that Casby's statement was being taken "regarding a murder," and that Casby's main purpose in continuing to speak with the police was to determine what had actually happened.

The Government disputes that Casby was unaware of the nature of the offense. The Government argues that Casby "was specifically informed that he was under investigation for first degree murder" when he signed the waiver form. (Rec. Doc. 114 at 3). Furthermore, the Government notes that Officer Rodrigue identified himself as a homicide detective before each of Casby's statements. As stated above, the Court agrees that Casby's testimony regarding the top of the Rights of Arrestee form and the volume of Rodrigue's voice are not credible. Furthermore, the Court notes that toward the end of Casby's first statement, Rodrigue informs him that "there was a fire set in the house" and that "people died as a result," although the number of survivors was still "unknown at this time." (Gov't Ex. B at 18).

The Court credits Rodrigue's testimony that any inconsistencies or vague statements

_____

that he had been awake for more than 24 hours at the time that he gave the third statement.

regarding the victims of the fire were due to genuine uncertainty in light of the brand new and

still-unfolding investigation. Even if it did not, however, the alleged deception would not rise to

the level of interfering with Casby's Fifth Amendment rights. The Fifth Circuit has held that

deception by the police must go beyond "mere emotionalism and confusion" or "mere trickery"

in order to render a suspect's confession involuntary. *Self v. Collins*, 973 F.2d 1198, 1205 (5th

Cir. 1992). In other words, "trickery or deceit [by the police] is only prohibited to the extent that

it deprives the defendant 'of knowledge essential to his ability to understand the nature of his

rights and the consequences of abandoning them.'" *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th

Cir. 2002) (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)).

Thus, the Court agrees, based on its factual findings, that Casby was aware of the general

nature of the offense for which the police were interrogating him. This general awareness was

sufficient for Fifth Amendment purposes; as the Government argues, the police are not legally

required to inform a suspect of all "possible subjects of question in advance of interrogation" in

order for the suspect to voluntarily, knowingly, and intelligently waive his Fifth Amendment

privilege. *Spring v. Colorado*, 479 U.S. 564, 577 (1984).

### d. Deception Regarding Assistance of Counsel

In one of Defendant's most serious allegations of police misconduct, Defendant claims

that the police tricked him into thinking he had received assistance of counsel. Specifically,

Defendant claims that a police officer posed as his attorney and encouraged him to give a

confession. As described in detail above, Casby testified at trial that Officer Rodrigue led him to

believe he would be speaking privately with a lawyer whom Casby's family had sent for, when

in fact he was speaking with a police officer. That officer allegedly encouraged Casby to

cooperate with law enforcement and confess to manslaughter. While these allegations, if true, would constitute a significant interference with Defendant's Fifth Amendment rights, the Court does not credit this largely uncorroborated and self-serving testimony, as explained above. Thus, the Court does not find Defendant's confession involuntary due to interference with his Fifth Amendment right to counsel.

The Court also does not credit Defendant's testimony that Rodrigue told him it would probably take until the end of the day to get Defendant a lawyer. Even if these allegations were true, however, they would not render the third statement involuntary under Fifth Circuit precedent, because Defendant received proper *Miranda* warnings. In *Soffar v. Cockrell*, the police misled the defendant far more egregiously, suggesting that getting him an attorney could take between one day and one month, and remaining silent when the defendant responded, "[S]o you're telling me I'm on my own." 300 F.3d at 591. Nonetheless, the Fifth Circuit held that the defendant's confession was voluntary on the grounds that the defendant "was well aware of his rights because he had been given numerous *Miranda* warnings and had waived his rights multiple times." *Id.* at 596; *see also United States v. Santiago*, 410 F.3d at 193, 203 (5th Cir. 2005) (citing *Soffar* for the proposition that police may use deception to secure a confession unless "the defendant is completely unaware of the rights being abandoned"). Thus, the Court does not hold that Casby's third statement was involuntary due to the JPSO's allegedly deceptive conduct in connection with his Fifth Amendment right to counsel.

### e.   Promises of Leniency

Defendant also claims that the police promised him that he would receive leniency if he gave a confession. As described in detail above, Casby testified during his state court trial that

while the police were interrogating him, they promised to give him a deal in exchange for making it look like he had acted in self-defense or in the heat of passion. The Government disputes these allegations and argues that the police simply "encouraged Casby to tell the truth" and "promised to make his cooperation known," which does not constitute an impermissible promise of leniency. (Rec. Doc. 114 at 17).

The Fifth Circuit has held that "a promise of leniency . . . may constitute psychological coercion." *Harris v. Beto*, 367 U.S. 567, 568 (5th Cir. 1966) (citing *Machibroda v. United States*, 368 U.S. 487 (1962)). However, the Supreme Court's opinion in *Arizona v. Fulminante*, 499 U.S. 279 (1991), clarified that alleged promises of leniency must be examined under the totality of the circumstances to determine whether they rendered a suspect's confession involuntary. *Id.* at 287-88. Accordingly, the Fifth Circuit has held that law enforcement's pointing out the advantages of cooperating, or promising to make cooperation known to the prosecutor, does not constitute coercion. *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1348 (5th Cir. 1994); *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996). Similarly, police officers do not coerce a suspect simply by encouraging him to tell the truth. *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978).

Based on the record before it, the Court concludes that the police officers' conduct in the instant case falls within the permissible range of encouragement and persuasion laid out in Fifth Circuit precedent. The Court has found Casby to be an unreliable witness, and therefore, it does not believe that Rodrigue or his colleagues made direct promises of leniency to Casby. Although law enforcement may have encouraged Casby to cooperate, such encouragement is permissible and does not render his confession involuntary.

**f.      Threats Preying on Paternal Instinct**

Next, Defendant argues that the police psychologically coerced him by preying upon his paternal instinct with threats of losing his daughter, Cyanna. Casby testified that Officer Rodrigue promised to help Casby if he cooperated, suggesting that Cyanna had "already lost one parent" and "wouldn't lose another one" if Casby confessed. (Trial Tr. at 81). Defendant argues that this was psychological coercion and rendered his confession involuntary.

Threats preying on parental instinct can constitute psychological coercion in some circumstances. For example, in *Lynumn v. Illinois*, 372 U.S. 528 (1963), the Supreme Court held that a defendant's confession was involuntary when it was given only "after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" *Id.* at 534. Similarly, in *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the Ninth Circuit held that it was improper coercion for a police officer to tell a 21-year-old defendant that she either might not or would not see her child "for a while" if she went to prison, to tell her that she had "a lot at stake," and to threaten to tell the prosecutor that she was "stubborn or hard-headed" if she did not cooperate. *Id.* at 1335-36. The *Tingle* Court held that police officers exert "improper influence" on a defendant "[w]hen [they] deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation.'" *Id.* at 1336.

As the Government points out, however, both *Lynumn* and *Tingle* represent more extreme examples of improper influence than the conduct Casby describes. Officer Rodrigue did not threaten Casby that his daughter would be taken away or that he would not see her for awhile if he did not cooperate. Casby's allegations, even if true, do not rise to the level of rendering his

confession involuntary.

        **g.**     **Physical Abuse**

Finally, Defendant alleges that police officers physically abused him in order to obtain a confession. At trial, Casby testified that during the interrogation, police officers "choked," "punched," and "slapped" him, as well as "tasing" him. It is clear that such physical abuse would render Casby's confession involuntary. *E.g.*, *Sims v. Georgia*, 389 U.S. 404, 407 (1967) ("It needs no extended citation of cases to show that a confession produced by violence or threats of violence is involuntary and cannot constitutionally be used against the person giving it." (citation omitted)). However, as the Court has already explained, it does not credit Casby's testimony due to its lack of corroboration and self-serving nature. Accordingly, the Court will not suppress Casby's third statement on these grounds.

**V.**     **CONCLUSION**

Setting aside the allegations that the Court does not believe, it is left with Casby's youth and lack of education, fatigue and sleep deprivation, encouragement to tell the truth, and possibly threats preying on paternal instinct. Even in combination with one another, these three or four factors are not enough to overcome Casby's will. The Court examines the voluntariness of a confession under the totality of the circumstances. In this case, the totality of the circumstances suggests that, while certain factors may have affected Casby on some level, his confession was nonetheless the product of free and rational choice, and therefore permissible under the Fifth Amendment. Thus, the Court will decline to suppress Casby's third statement. Casby will, of course, have the option of presenting these arguments to the jury, who will remain free to conclude that the confession was involuntary and disregard it.

For the foregoing reasons, IT IS ORDERED that Defendant's motion to suppress (Rec. Doc. 97) is DENIED.

New Orleans, Louisiana this 13th day of June, 2013.

_____

UNITED STATES DISTRICT JUDGE